Good morning, your honors. Sean Reardon appearing on behalf of the appellants. I'd like to reserve three minutes for rebuttal, please. May it please the court. This is a case about getting to the merits of an important question involving fundamental individual liberty. In particular, whether an individual who is grossly disabled may be detained for four and a half years without so much as a detention hearing to determine whether his imprisonment is justified. Now the government argues, according to its own declaration, that it will not take Mr. Gomez back into custody unless, quote, required by law. But the law that governs Mr. Gomez's detention is precisely the question that has yet to be resolved in these proceedings. With that question unresolved, there are primarily two reasons why this case continues to present a live controversy for an Article III court to decide. The first reason is that the government has not, in fact, surrendered its discretion to lock Mr. Gomez up again. In fact, the government's declaration says that it may lock him up if, quote, required by law. Now, the reason this is significant is that the government has acted as if it has sole, unilateral, and unreviewable discretion to determine what law applies to Mr. Gomez and under what circumstances. Well, ICE's conditions of release require that Gomez had to wear an electronic monitoring device, report to any hearing or interview as directed by ICE, not change his residence without written consent. That's right, Your Honor. There are conditions out there. And there are other conditions as well, Your Honor. Okay. That's right. And that actually gets to the second reason why. So he's not without any future burdens. And so habeas lies. Habeas lies. Please, Your Honor, I'm sorry. No, no. That's your argument. Yes. The habeas law is absolutely clear that under the circumstances of release on such conditions, there is an ongoing controversy for a court to decide. How do you distinguish the Pickren-Perron case? Your Honor, there are three primary reasons why Pickren does not control this case. First of all, the conditions for redetention in Pickren were all fairly outside the government's control. Here, there's at least one condition that's particularly within the government's control, and that is that Mr. Gomez may be locked up again if his detention is required by law. So that's one reason why Pickren is distinguishable, is that the types of conditions that the declaration set for redetention are different. A second reason why Pickren is distinguishable is that there was no history there of the government shifting positions as to its legal authority for detention or release. From the beginning, Pickren was a case about the detention statute covering arriving aliens. Here, the government has shifted positions as to detention authority, which indicates that it may in fact shift positions again in the future. And the third reason why Pickren is distinguishable is that at the time Pickren was decided, there was no apparent record of the government using release as an attempt to try to moot cases, where here we have a recent record indicating that the government has something of a pattern of doing this. Just to give a few examples, in a companion case to Gomez-Sanchez, which was actually filed on the very same day in the Central District, which also involved a gravely disabled immigration detainee who the government had argued was subject to mandatory detention, that individual was also released a mere few days after the petition was filed, and the government then argued that the case was moot. In Clark v. Martinez, which we cite in our briefs, after our argument in the Supreme Court, which didn't go particularly well for the government, one of the petitioners was released and the government then argued that that person's petition was moot and the court had no need to decide the issues. In Rodriguez v. Hayes, which we also cite in our brief, the government released the petitioner, who had been detained for several years shortly after litigation was filed, and the government then argued the case was moot. There's one other case I'd like to cite. This is currently outside the record, although the court could take judicial notice of it. In August of this year, we filed a habeas corpus petition in the Southern District of California on behalf of a man named Glorios Melsenteno, who the government had detained for approximately three years, continuously arguing in administrative proceedings that he could not be released because he was too dangerous. As a few days before the government's return was due, this is about two weeks ago, the government released him from custody on conditions and subsequently filed a very similar declaration to the one filed here before the district court, trying to establish that the case is moot. So, you know, given the pattern... Have you submitted that case to this court? I'd be happy to submit the government's return, Your Honor, as a judicially noticeable document. From the clerk, you can get the forms and submit them to counsel as well. Okay. Thank you, Your Honor. So, we have a different... Do you have that document with you today? I don't have a copy of the return on me currently, Your Honor, although I will submit it in short order after argument. And to get back to... Submit it today. I'll do that, Your Honor. That's short order. That's entirely possible. Your Honor, to get back to your point about some of the conditions, that comes to the second primary reason that this case continues to present a lot of controversy that requires resolution by an Article III court. And that is that an immigration judge's hands are effectively tied by the Board of Immigration Appeals' prior determination that Mr. Gomez is subject to mandatory detention. And because the immigration judge's hands are effectively tied by that BIA order, which the government fought for and won, it's implausible to think that he can just go to an immigration judge now and request that these conditions be modified. Now, Mr. Gomez has now been on electronic monitoring for approximately 18 months. He's living under conditions of release that require not only that he not violate any state or federal laws, but that he not violate any local ordinances. You can imagine how easy it would be to violate an ordinance, for example. These are all issues that Mr. Gomez would like to take up with an immigration judge were an order entered by an Article III court establishing definitively that he may not be subject to mandatory detention because he was detained so long without a bond hearing. Isn't he required to seek a redetermination to exhaust his remedies? Your Honor, that's a point that the government has made, although we find it to be a difficult point because Mr. Gomez, in fact, went to an immigration judge seeking a redetermination of his custody in the first place. And the immigration judge found in that proceeding that his release was appropriate. And instead of letting that decision by the immigration judge ordering his release rest, the government appealed it to the Board of Immigration Appeals and obtained an overruling and vacation of the immigration judge's order. That BIA ruling, as we understand it, continues to have legal force, regardless of the fact that the government now says, in response to this litigation apparently, that Mr. Gomez Sanchez is detained under the non-mandatory detention provision, 8 U.S.C. section 1226A. So if this court were to find that the case is, in fact, moved, we would also ask, however, that any deadline for him to be sued. What is that non-mandatory detention provision? What does that cover? The non-mandatory detention provision, 8 U.S.C. section 1226A, that's a general detention provision. It provides general authority for detention or release of individuals in Immigration and Customs Enforcement custody. Now, the government, of course, argued in the administrative proceedings prior to this case being filed that that provision could not apply to Mr. Gomez because he was, as a categorical matter, subject to mandatory detention under section 1226C as long as his removal proceedings were ongoing, which they still are. There's one more point that I'd like to touch on, Your Honors, and that is that the government has made a lot of statements in its brief in what appears to be an attempt to rewrite the declaration. There are several reasons why the court does not need to find that those statements are binding. First of all, the courts have on many occasions commented that statements made by litigation counsel in the course of litigation does not bind an agency. In addition, we cited a number of cases in our brief showing that statements made in the course of litigation are also not sufficient to moot a case generally, that there has to be something more than just a statement of intention not to do something in the future. And finally, despite these statements, the government hasn't changed its policy as to individuals in Mr. Gomez's position. What is it you want us to do? Your Honor, we request a remand to the district court for a determination of the merits as to whether Mr. Gomez is entitled to immigration judge authority over conditions affecting his liberty. I'd like to reserve my remaining time for rebuttal. Good morning, Your Honors. May it please the Court, Theodore W. Atkinson, it's my privilege to appear before you and represent the government. Mr. Gomez Sanchez has the ability and had the ability to go to an immigration judge and request that the conditions set by ICE when they released him be revisited, be ameliorated, be changed, be taken away, and that he be released on his own recognizance. They do not address this point anywhere in their briefing. They had, at the time that ICE released him, they could have gone immediately, immediately, to an immigration judge and said, we do not like electronic monitoring. We don't like the conditions that were set. The other conditions were fairly low-level. Report on time. If you were ordered removed, you have to cooperate with your removal. Don't break the law. They could have challenged any and every one of them in front of an immigration judge within seven days after he was released. They could have done it immediately. If they missed their seven-day deadline, they could have made a formal request to ICE to reconsider the conditions of his release. And if they didn't like that decision, they could have gone to the board, which could have taken up the appeal on that. They did none of those steps. How long does it take to go through all of that? To get a hearing before an IJ, in my experience, Your Honor, if they had made the request, they probably would have had an IJ bond hearing within a month. And how about going back to the board? Well, they would have gone first to ICE had they requested that through ICE. Then, given the condition, given the type of case that it was, the ICE would have moved probably fairly quickly, although I don't have any experience to indicate how quickly. And then it would have been moved to the board if they did not like the determination by ICE. How many people do we have in detention? In this case, we have none in detention. No, I mean overall. I don't know the answer to that, Your Honor. It's a lot. I don't know the answer to that, Your Honor. I can't characterize a lot or a little. There are a large number of people in detention. Large number of people. That's right. But we're focused on this case. This is not a class action case. The Franco-Gonzalez case. I'm just asking you some questions. Sure. On how the system works. I can tell you. I'm learning every day. Do you understand that? I do, Your Honor. Okay. These conditions have been imposed on Gomez's release. The monitoring, the reporting, and all the rest of it. Now, why doesn't Habeas lie for that? It does in all other cases. That's not true, Your Honor. If I can take a couple of minutes and explain how the system works. I'm talking about Habeas in general. The Ninth Circuit has said that when a custody determination is made by ICE, and if an alien challenges it, Habeas does not lie. In general. In general. Criminal matters. I don't know the answer in criminal matters. This is a civil administrative procedure. Well, don't you have any curiosity as to how all this works? I have an understanding as to how all this works, and I also know that the Ninth Circuit has said that when a custody determination is redetermined by an immigration judge, which they had the opportunity to do, there is no Habeas jurisdiction over that determination by an I.J. after the administrative process has been. Let me make sure I understand this. The conditions were imposed by Homeland Security. Is that correct? After consultation with Mr. Gomez-Sanchez's Immigration Council. Okay. But the determination had already been made by the BIA that the immigration judge did not have jurisdiction. Under a different statute. Well, but that's the statute that the government claimed was applicable. Claimed, but then relinquished that, and in any event said they would not redetain him. Let me explain that, because that is a little bit confusing. Mr. Gomez-Sanchez was convicted of two pretty serious violent crimes. Under that formulation, under 8 U.S.C. 1226, that is the statute that generally governs detention. There is section 1226A, which says that the attorney general may detain or may release at his discretion, now the Department of Homeland Security after 2002. Let me interrupt for a moment. You at first argued that it was mandatory detention. That's correct. And then you changed it, your claim, saying it was discretionary. That's correct. ICE made that determination after consultation with counsel after the Habeas petition was filed. I am not privy to those consultations. It may very well be that in looking at the law under the Ninth Circuit regarding prolonged detention, ICE determined that the only way they could detain him was under 1226A. Well, then Mr. Gomez's situation could change depending on, at some later time, that the government changes its mind. That is incorrect, Your Honor, and here's why. Following this court's law in Pickering-Perrin, after Mr. Gomez-Sanchez was released, this office, I, looked at that law and said, okay, under Rodriguez and Clark, ICE made no effort to disclaim its discretionary authority. They said, we've released him. That should be enough to move the case. And this court said, no, it's not enough to move the case. And then the Supreme Court in Clark, the Supreme Court said, no, that's not enough to move the case. You've got to do more to show that you are giving up your discretion to re-detain him. So what we did, what ICE did, following Pickering-Perrin, is to submit a declaration to say, we're not going to re-detain him. Mr. Reardon didn't like the wording of the declaration we submitted to the district court. He screamed and hollered that the statement, ICE has no intention to re-detain, was not enough because their intention could change. Fine. What we did is we then filed a supplemental declaration that said, we will not recommend re-detention, which means we will not re-detain except under three circumstances that we have no control over. He violates the law. He's ordered removed, which, in which case, his detention is mandated by an entirely different statute and an entirely different structure. But he can't be re-detained until he's ordered removed. Or he is required to be detained by law. Now, what that meant, and this was not pounded on by Mr. Reardon at the district court. He pounded on the no intention thing. So we fixed the declaration. Didn't say required by law means that you can change your mind. He said, required by law is squishy. We said required by law simply means if there's a change in the law, Congress passes a new statute, which there's no foreseeability that it's going to do, and amends the INA, or DHS passes some new regulation to rulemaking authority, that would be the circumstance, again, beyond ICE's control, that they would re-detain him. It's not that ICE believes that it can change its view. And having now publicly and formally said, you're right, ACLU, he is not detained under 1226C. He is, in fact, properly detained under 1226A. We give you that. We concede that. And under 1226A, he has many more opportunities to challenge his detention than he would have under 1226A. Under 1226C, he has none. Under 1226A, he can go to a – the way it works is if you are detained under 1226A, under the applicable regulations of HCFR 236.1, there's a three-step process. ICE first determines the conditions for your release. They can either detain you or they can release you and say, here are the conditions that we think are necessary given the fact that you assaulted a police officer and you were convicted of assault with a deadly weapon. We set these conditions. They did that. The next step is if Mr. Gomez-Sanchez did not like that, he could go to the IJ and say, I don't like that. I want you to do a bond hearing for me. You determine my flight risk. You determine my danger. You set the conditions. They did not do that. There's something a bit peculiar, if not unfair, about the fact that your side of the House argued that the immigration judge did not have jurisdiction at all, and now you're claiming he hasn't exhausted by not going back to the immigration judge who you took the position – not you, but your side took the position didn't have jurisdiction in the first place. That's correct, and the board said that we were correct, that ICE was correct in that position. That was ICE applying a different statutory provision, 1226C, which provides that aliens must be detained, do not get a bond hearing, cannot go to an immigration judge to get a bond. That was the position that ICE took. The habeas petition was filed, and for reasons that I do not know, but it could be, and I would be supposing, but I suspect that they looked at the Ninth Circuit case law, and they said – I thought you said when you started, you were the man over there. Well, I'm – That's what you said. Me, you said. Right. Well, no, no, no. That was after – You're the man. I'm a man. There were other – You said, I'm the man. Right. Well, I'm the one who, when they determined that he was going to be released, I said, fine. If you're going to release him, release him. None of this scurrying around sort of, well, we can re-detain him in the future if we want, because it's not going to fly. If you're going to release him, commit to releasing him. You're not going to re-detain him. They said, fine, what do we do? Picker and parent. You submit a declaration to the district court, and you say you're not going to re-detain him. Let me ask you a question about that provision in the declaration that says required by law. You're now telling us that you mean that to be Congress passes new legislation. That's what you've said. You mean by that. That's what we're representing to the district court. Okay. If you filed – let's assume that this court held that this issue was not moot, and you filed a new declaration that said that that's what required by law means, can you moot this case now on appeal by filing a declaration here? I don't know the answer to that because I'm not sure that – I don't know the answer to that, Your Honor. Okay. Didn't consider it because this is a court that deals with the record below it. But the district court found that that was sufficient, right? The ACLU pointed out a flaw that they – a concern that they found in our initial declaration, the intention statement. ICE has no intention of recommending re-detention. They said that's not strong enough because your intentions may change. I, the man, went back and said, you know what, we'll reconsider that. So we submitted a second declaration that said we will not re-detain. Now they want – now all of this required by law stuff comes up for the very first time on appeal. And I'm guaranteeing you that had we been before the district court, we would have screamed uncle just that much louder. And that's really the question here is how much does the government have to do before it can totally and completely say, we withdraw our discretion, we will not re-detain this man. We thought we did that in the declaration that the district court found sufficient. On appeal, new issues are raised as to required by law. And what that really means is ICE can, the day after this is argued, that ICE could somehow turn around and say, well, we have made a custody determination that you may be released on bond and you can go before an IJ and you can challenge the terms of your conditions. That somehow we'll be able to turn around and go back the other way and say, no, we were just lying to the Ninth Circuit and the district court. We now find you under 1226C. That would be foolish to the extreme. It's not what they want to do. It's not what they intend to do. They submitted a declaration that said we're not going to re-detain you. If you go out and rob a bank, sure we'll re-detain you because you'll have committed a new offense. If you're ordered removed, then we've got no choice under the law after you're ordered removed to detain you for a short period of time while we effectuate your removal. That's a condition that's out of our control. You robbing a bank is out of our control. You violating a city ordinance is out of our control. And the required by law, I now almost regret throwing that in there because it simply was a catch-all, not even a catch-all, a specific circumstance where if the law changed, which is again beyond ICE's control, we told that to the district court. That's what that means. We have amended our declaration to address the concerns of the ACLU the first time. There's no reason why we wouldn't have done it the second. And all that set aside, it would be very difficult if not impossible. And in fact, I believe it is impossible for ICE to now say, we find you detained under this statute, but now you're actually detained under this statute. I think that's a one-way ratchet. I think you can go from 1226C to 1226A, but I don't think you can go back from 1226A to 1226C, barring a new offense. Well, there's a little lever on the ratchet, you know. There is. My dad has two, and he's got a one-way ratchet. I used to sell ratchets, so I know where I come from. So I really, just with regard to the... So the ICE has a hold on this man, right? They do. In the real world. Well, yes and no. Yes and no. Your Honor, I see my time has expired. We can detain you as long as you want. You certainly may. That is absolutely true. But here's what... We're starting to show your human side, too, so it's good for you. Well, thank you, Your Honor. As a government attorney, I know that's sometimes very difficult. But let me just... Don't I love government attorneys. Let me answer your question by saying this. What this court and what any court is bound by is what they asked for in their petition. And what they wanted was his release. And they said, and when you release him, we'd like you to do it on set terms. ICE released him from detention, which is what they wanted. They wanted him released from detention. They set terms and conditions given the fact that this man assaulted a police officer and then was convicted of assault with a deadly weapon. That's their right and their obligation under the statute to set the initial terms, the initial terms, which can then be, under the administrative process, taken before an immigration judge, which they did not do and cannot explain why. And they did not take... If they didn't like that, they did not go to the board. They did not go back to ICE. There were several avenues they could have taken. Were they representing this gentleman at that time? They certainly were. They blew the seven-day period. Yes, and not only that, Your Honor, but they now complain that the electronic monitoring should be a basis for habeas. But as the district court said, that was not before the district court. They released him, and then there was four months before the district court decided that it lacked jurisdiction on mootness. Not once did Mr. Reardon or anybody else seek to amend their petition to challenge the electronic monitor. That was not before the court, and that cannot be a basis to remand this case. Tell me why habeas doesn't lie. It is different from criminal habeas. The Ninth Circuit, it goes back even deeper. As part of the national sovereignty, Congress is, in ways, not so specific in other areas. The Constitution says that Congress shall have authority over naturalization and, essentially, immigration matters. And because of that, that line of case law has traveled down one path, where there is, and there are numerous Supreme Court cases that talk about this, the almost plenary authority of Congress to determine who can stay and who must go, who can come into this country and who cannot. That's a fundamental bedrock constitutional principle. So Congress can pass a statute that would declare that all children born in this country of a mother who is an illegal alien need to leave the country. I think the answer to that is no.  Well, it's plenary, but that's the fundamental bedrock. You start there, and then you go over the course of decades, more than two centuries now, of that bedrock principle being shaped by case law and decisions. And courts have said, well, there are limits to that. There are certain things you can and can't do. And that takes us up to the present day, where the Ninth Circuit has said, look, once, very recently, within the last couple of months, the Ninth Circuit has said, look, once you have been given an opportunity to challenge your detention and you've got a bond hearing and a judge has determined whether or not your conditions are correct, whether you're flight risk or danger, that cannot be challenged in a district court in Hades. Can I ask you a question? Yes, sir. Why are these people kept in detention so long? When does this move on? There are a variety of reasons. In a number of cases, aliens ask for continuances. That's not surprising. Aliens appear before the immigration judge. They don't have a lawyer. Your Honor, I'd like time to get a lawyer. So they go, and the judge gives them a certain period of time to get a lawyer. They come back. Maybe they want more time for it. They get lawyers that in many cases are incompetent, and the government complements us. Go ahead. But there are a number of reasons. That's changing. That is changing. That's changing. It is changing. And, in fact, the Ninth Circuit has done a very good job, I'm sure from the ACLU's perspective, in limiting how long. Yes. No, no, no, no. No, I'm not. Cast asparagus on the ACLU. I would not do that, although it is my favorite vegetable. But I would say this. Look, the limits. That was a joke. I understand. Well, I said it was my favorite vegetable. Look, there are a variety of areas in which this court and other circuit courts are limiting the scope of immigration law, and particularly with regard to detention. And that's fine and good. I mean, that is the way our system works. We're talking here about an individual case, and we're talking about some pretty fundamental concepts of mootness and when you can moot a case out and when you can't. And we did what this court said you should do by submitting a declaration that we thought provided as strongly as humanly possible the representation by the government that they will not re-detain this man. He's released. He shall not be re-detained. If he doesn't like the terms of his release, which ICE was required to set, they could have challenged it to an immigration judge. The doctrine of exhaustion of administrative remedies is alive and well in this court, and they did not do it. They cannot remand on something that they did not ask for the first time and that they forgot to ask for in the administrative process. Habeas does not lie. If he's such a danger, why even let him out to begin with? We tried not to, Your Honor. And a habeas petition was... Why, if he's a danger and he's engaged in criminal conduct, why not prosecute him? Well, he was prosecuted. He was convicted. He was convicted. Twice. So why is he still here? Because his removal proceedings have, for a variety of reasons, gone on longer than they should. That is an issue that I'm sure will be addressed in another context in another way in this case or another. And just so you know, because this wasn't in the briefing, his next merits hearing is scheduled for December 8th, and it's likely that the final resolution of his removal proceedings will be decided at that time. If he wins there, that's it. The case is over. He doesn't get removed. If he loses there, then he can appeal to the board. He may then have other challenges, like the ones you heard earlier today. But he... This case is presented on a narrow issue. He's an illegal alien. He's in detention. We keep him in detention because he's dangerous. And through our grace, we're releasing him under certain conditions. And he's really got no business complaining about it. No, he can complain all he wants. He can complain all he wants. To the immigration judge. Yeah, but he's got seven days. Well, but if he doesn't... I can't explain why they didn't do what they were supposed to do in seven days. That's them not following the rules. I can't explain that. But even if they blow the seven-day deadline, they can ask for a redetermination by ICE, and if they don't like that, they can take that up on appeal through the administrative process. And the Ninth Circuit has said that process needs to be exhausted before you go to a court. All right. Thank you, Your Honor. You're a charming fellow. Thank you, Your Honor. No matter what happens, that's something. So what happened to the seven days? Your Honor, and this I think goes to the statement made by Judge Lynn, Mr. Gomez exhausted his administrative remedies. He went to an immigration judge and he sought release. The government then took the position that he could not be released because he was subject to mandatory detention, went to the Board of Immigration Appeals, which when it issues decisions, those decisions bind all immigration judges, and obtain this ruling that he is subject to mandatory detention as a categorical matter. Now, counsel for the government suggests that we should have gone to an immigration judge to seek to ameliorate his conditions as soon as he was released on this habeas petition, but there are a number of problems with that. The first problem, of course, is the one that I already mentioned, which is that the Board of Immigration Appeals had spoken as a matter of law and determined that Mr. Gomez was subject to mandatory detention, and that for that reason an immigration judge could not hear any complaints about his detention or other custody. But that changed. They changed their position. So at that point, what would have prevented you from going to the immigration judge and say, change the conditions? Well, to be fair, Your Honor, when the government issued the release order, it didn't put in a statement that the law has changed. And in fact, it hasn't put in a statement, today the law has changed. All it has said is that we have released Mr. Gomez under a different provision than we previously argued governed his detention. So the government... It went through C. Right, it went from C to A, Your Honor. C to A, excuse me. And so what's sort of interesting here is that Attorney General Holder is named as a respondent in this case and is an appellant here. The Attorney General has the power to issue Attorney General opinions that bind the Board of Immigration Appeals. He has the authority to review decisions that the Board of Immigration Appeals makes. That was not done in this case. So the government certainly had the opportunity to change what the Board of Immigration Appeals said about Mr. Gomez's custody, and it did not. But to get back to the point in terms of why we didn't go to the immigration judge within seven days, when Mr. Gomez was released, we received the papers related to his release. But nowhere in the papers was there a statement that Mr. Gomez was released under Section 1226A specifically, the section that would, were it legally binding on the agency, provide immigration judge authority over custody issues concerning Mr. Gomez. Now, much later, of course, the government said, oh, you failed to exhaust, but for the reasons already stated and the reason that in the papers outlining the release themselves, that was not made clear at all. We, of course, were proceeding on the assumption that the immigration judge would continue to follow the law and would apply what the Board of Immigration Appeals had already said about Mr. Gomez. I want to ask a question about this law-changing issue. If the trial court found, essentially, that this means what the government is arguing it means, that there is a change in the law, Congress passes a new law, if that's what that declaration means, isn't this case just like Pickering? I don't believe that the trial court made that ruling, Your Honor. If it had, then this would be a different case. But what the trial court said is that the government has abandoned its discretion by putting in this limiting declaration. And as we pointed out, under longstanding voluntary cessation principles that govern mootness analysis, a statement made by a party in response to litigation to try to moot it is insufficient to show that the case is moot. There has to be something else to show that it's absolutely certain that the challenged conduct could not be expected to recur. Now, the sort of core problem in all of this came, you know, we heard from the government on this. The government thinks it has special plenary authority in immigration matters that also extends to detention issues, that also extends to issues implicating fundamental individual liberty. Now, certainly the government does have plenary immigration authority as to certain issues governed by immigration law. But as the courts have made very clear, there's also this matter of the Due Process Clause of the Fifth Amendment that limits the exercise of that plenary authority. But in articulating that position, the government demonstrates in part why this is a live controversy. The government believes that it has the prerogative to decide what law governs individuals' liberty. When it was convenient for the government to say that Section 1226C governed Mr. Gomez, it argued that, and it won on that point. Now that it's convenient for it to argue that Section 1226A governs, that's the position it's taken. Thank you, Your Honor. Thank you. So is that your position? Yes, Your Honor. You have to stand because it's good for your blood circulation. That is not our position at all. There are a couple of things that Mr. Reardon said that were just patently wrong. Their own briefing suggests that the only way that ICE could release him, right, there are two paths. Under 1226C, ICE has to detain him. If they're going to release him, the only statute that he could be released under is 1226A. So this talk of, well, you didn't give us notice that you were releasing him under that, we didn't know, that's crazy. The only authority for ICE to release an alien is under 1226A for an alien in Mr. Gomez Sanchez's time. The statement that we couldn't have gone to an immigration judge is just flat wrong. It's flat wrong. And to say that the government had said previously that 1226C bound his detention, yes, the government did say that. And when ICE was served with the habeas petition, ICE, in consultation with its counsel, not me, made a determination that maybe we were wrong and maybe 1226A does apply. Maybe he is subject to release. That's what they did. And they're saying that's not enough. I don't know how the government could have more clearly said, we've changed our position, you're right, we're wrong, he's subject to the statute that you say he's subject to. We're not going to re-detain him. Here's a declaration that says so. You don't like that? Here's a second declaration that makes it stronger. Everything good? Are we fine? Good. We'll see you later. Because he's never coming back into our custody again. That's the government's position. Does the custody have that seven days from the time that, does that seven day period start to run from the time you switch from seat A? Yes. By the time that they release him and gave him his, what ICE would call a custody determination. We're releasing you. Here is your, here are the terms of your release. And they know darn well that the regulations say if you don't like that, go to an immigration judge. He's got no good answer except for patently wrong characterizations of which statute applied as to why they didn't go. They didn't go because they wanted to take their chance here. Okay. All right. Please go ahead. What did he say? Can I respond to that? Oh, sure. I would just refer the court to the record of those release documents, which counsel may characterize those as giving us notice about the issue as to what authority he was released under, but those didn't make clear exactly what authority that was. And, of course, we were thinking about this in terms of the longstanding position that the government had taken, which is that he was subject to mandatory detention. Thank you. Okay. So, all right. Okay. We're through for the day and we'll return tomorrow morning. And thank you for the arguments. Thank you, Your Honor. All rise. All cases are submitted. This session stands adjourned. I can't say that wasn't unusual.
judges: Lynn, Pregerson, Nelson